UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

ANNIE LOVE AND CHASITY D. YOUNG     CASE NO.: 1:03CV638-D-D
AS PERSONAL REPRESENTATIVES OF
THE ESTATE OF DAMOND D. HOWARD,
DECEASED,

                Plaintiffs,

v.

FORD MOTOR COMPANY,

                Defendant.

_____/

**PLAINTIFFS' MOTION IN LIMINE
(ISSUE NUMBER 3) TO EXCLUDE ACCIDENT STATISTICS AND
TESTIMONY OF FORD EXPERT WITNESS JEYA PADMANABAN.**

Plaintiffs respectfully move the Court for the issuance of the following orders in limine:

1. An Order precluding Defendant Ford Motor Company ("Ford") from offering into evidence accident statistics that have been proffered by Ford's expert witness Jeya Padmanaban, and prohibiting the Defendant from attempting to introduce any statistical evidence, as any such evidence is irrelevant and/or unduly prejudicial and an undue waste of time.

2. An Order requiring the attorneys for all parties to instruct their witnesses of the Court's exclusionary order on this Motion; or, in the alternative,

3. An Order requiring the attorneys for the Defendant, prior to making any references, comments, or assertions concerning statistics or other automobile accidents, to approach the bench and make an offer of proof to the Court, so that it may make a preliminary determination of relevancy and admissibility thereof, prior to any presentation of the above-referenced evidence to the jury.

## I. INTRODUCTION

The Plaintiffs respectfully move the court for an order in limine to exclude statistical evidence of other accidents, which Plaintiffs believe Ford intends to offer at the time of trial to

buttress their defense that the Ford Explorer rollover accident rates and death and injury rates compare favorably to other sport utility vehicles.

There are numerous problems with this evidence, but the two most significant problems are: (1) the statistical comparisons prepared by Ford's expert Jeya Padmanaban ("Padmanaban ") are irrelevant; and, (2) the accidents which form the basis of the statistics are not substantially similar, and indeed are remote, to the accident in this case.

## II. STATEMENT OF FACTS

In discussing the faulty logic and faulty comparisons offered by Padmanaban, it is important to first review the accident at issue in this case.

### A.  The Howard Accident

This is a wrongful death action brought under several theories of liability arising from the fatal injuries suffered by Damond Howard in a rollover accident involving a 1996 Ford Explorer vehicle. The accident occurred when Plaintiffs' Decedent, who was traveling northbound along U.S. Highway 45, in Monroe County, swerved to miss a deer in the road. The Ford Explorer he was driving suddenly and unexpectedly lost control and rolled over during Mr. Howard's foreseeable accident avoidance maneuver. Mr. Howard's door opened during the accident and he was ejected. Plaintiff's claims center on the lack of rollover stability of the Ford Explorer and the improper design of the door which allowed it to open.

### B.  Ford's Statistical Expert's Opinions

Jeya Padmanaban is a professional witness who routinely testifies for the automotive industry. In fact, she was the author of the original statistical work done on Bronco II prepared for Ford's lawyers. She always offers the same core opinion. Namely, that when the Explorer is compared to other "comparable" SUVs, it is not the worst, but instead, in the middle of the pack.

2

Padmanaban's opinion in this case (and virtually every other case) is that her statistical analysis indicates that the Ford Explorer (or whatever other vehicle is at issue) is not the worst in the pack and thus should not be considered defective:

> The four-door, 4x2 1995-2001 Ford Explorer performs extremely well in real-world rollover crashes. My research on available accident data from several state and federal agencies confirms that the real-world performance of four-door, 4x2 1995-2001 Ford Explorer vehicles shows no elevated risks of rollover nor of fatalities or injuries to occupants in rollover crashes. (See **Exhibit A,** Padmanaban Report, page 4)

The basis of all of Padmanaban's opinions are databases of accident information maintained by several state and federal agencies. Padmanaban does not review the accident reports, and makes no effort to compare the accidents in litigation cases to similar types of accidents contained in the databases. Padmanaban also makes no effort to eliminate any dissimilar accidents from her statistics. Padmanaban merely presents numbers with no mathematical analysis to relate her "statistics" to substantial similarity in either vehicle or accident or proximity of time. Consequently, Padmanaban is attempting to compare all accidents to the accident in this case, even though this case involved a single vehicle rollover on a flat surface with a door opening and ejection. One of the more disconcerting elements of deficiency within Padmanaban's so-called analysis is that she does not even attempt to obtain police reports or police photographs to evaluate whether Damon Howard's accident and those in her analysis are substantially similar. Nor does she attempt to compare any similarities other than rollover and fatality or injury:

> Q (BY MR. BARNHART): Other than the fact that they have this similarity, that they are a rollover and there is a fatality, and I'm just talking about the FARS data now.
>
> A Okay.
>
> Q Can you tell us any other features of these accidents that are the same

3

as the accident involving Mr. Howard?

THE WITNESS: I have not broken it down to any other detail other than it's a rollover accident.

Q Okay. Now, in the ten state analysis that you did, other than the fact that there was a rollover, was there any other distinct -- any other feature of the accidents that you examined to compare them with the Howard accident?

A Again, other than the fact it's rollover accident, what is the risk of injury to a belted driver or an unbelted driver in an Explorer versus other comparable vehicles, we didn't break it down into any other finer detail.

Q I apologize if I've already asked this question. Is it correct that you did not go and look at any of the accident reports of any of the ten states that – whose data that you used?

A No, I did not.

Q Okay. And is it correct that you have not gone to the accident scene in respect to any of the accidents that you used in the ten state analysis or in the FARS analysis?

A That's correct, I have not looked at any accident scene.

Q Is it correct that you have not looked at accident photographs, scene photographs, or photographs of the vehicles, in any of the ten -- accidents you used in the ten state analysis or the FARS analysis?

A That's correct.

Q Now let's go to the next category. Did you make any analysis in either the ten state work or in the FARS work to determine whether or not the vehicle began to roll while the tires were still on the paved surface?

A No, I did not. (**Exhibit B**, Padmanaban deposition transcript, 74:5 – 75:24.)

Padmanaban "door opening" analysis is just as generic and non case-specific·

Q So, it is your opinion that there is not a substantial risk of injury to a belted passenger or occupant in a rollover if a door opens; is that right?

4

    A   Yes.

    Q   And you are asking the Court and jury to accept that opinion based upon statistical evidence; is that right?

    A   Yes.

    Q   All right. And would you agree with me that -- well, first of all, have you reviewed the accident reports in the 1,640 cases in which the door opened?

    A   I think there are 1,840. But, no, I have not.

    Q   Have you reviewed the details of NHTSA's investigation of those -- of any of those 1,840 cases in which it was found that a door or hatch opened?

    A   No, I have not. (**Exhibit B**, Padmanaban deposition transcript, 32:2 – 32:21.)

This failure to eliminate dissimilar accidents from the comparison is a fatal flaw from any legitimate statistical analysis which makes the entire exercise inherently suspect and misleading. Furthermore, the failure to even obtain police reports and to try to find substantially similar accidents makes the so-called analysis not only suspect, but entirely inadmissible.

The failure to compare similar accidents to similar accidents and the resulting lack of admissibility of the analysis is so basic that Ford Motor Company would have to and **DOES AGREE** that the evidence should not be admitted. Ford's attorneys have themselves made precisely the same motion, for the very same reasons, in a case involving the rollover of a Ford Explorer: "Aside from the vehicle itself, plaintiffs must also establish, which they cannot, that the accidents underlying the statistical study occurred under substantially similar circumstances, including a collision, on substantially similar roadways, at similar speeds and while the driver was executing similar driving maneuvers to those of Mr. Lajeunese. Likewise, plaintiffs must establish, but again cannot, that the driver's actions, reactions, and conditions in the accidents

5

reported in the underlying FARS data were similar to Mr. Lajeunesse's driving behavior to meet the substantial similarity test, including such factors as the driver's steering input, braking and acceleration actions, among others." **See Exhibit C**, Ford's Motion in Limine in *Lajeunesse, et al. v. Ford Motor Co.*, S.Ct. of California, Case No. CIG755577, pages 8-9.

The second inherent deficiency in the statistical comparisons Ms. Padmanaban made between the Explorer and other "compact" utility vehicles is the fact that many of the vehicles the expert used in the comparison are not substantially similar to the Ford Explorer. Furthermore, Padmanaban includes data regarding passenger cars and light trucks, which have absolutely no bearing whatsoever in this matter.

In short, there is no "substantial similarity" at all between the vehicles and circumstances examined by Padmanaban and the Ford Explorer and the accident in this case. This type of evidence is irrelevant, misleading, confusing, and prejudicial given that the vehicles involved in the testing are entirely dissimilar to the Ford Explorer and the statistics are not refined to circumstances even slightly similar to the circumstances in this case.

### III. LEGAL ARGUMENT

**A. Ford's Statistical Comparison Of Accident Rates Between The Ford Explorer And Other Dissimilar Vehicles Is Irrelevant On The Issue Of Design Defect**

Pursuant to F.R.E. 401, "relevant evidence" means any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is not relevant is not admissible. F.R.E. 402. The "disputed fact" at issue here in the Love case is whether the 1996 Ford Explorer is defective. Ford seeks to divert the jury's attention away from its own conduct by arguing that other motor vehicles roll over (in a wide range of different accidents

6

occurring with different vehicles and under different conditions) and therefore the Ford Explorer is not defective. However, such evidence is simply not relevant to this case.

"Defective" is defined as "not meet[ing] the reasonable expectations of an ordinary consumer as to its safety," and a product "is defective because of inadequate instructions or warnings when the foreseeable risk of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings ... and the omission of the instructions or warnings renders the product not reasonably safe". *Restatement (Third) of Torts: Products Liability* § 2(c), at 14 (1998); *Mississippi Code* § 11-1-63. Product Liability Suits.

The plaintiff's burden is to show that the Howard's 1996 Ford Explorer is a defective vehicle under Mississippi products liability litigation. It is irrelevant how other products perform. Evidence that other manufacturers make products that are similar to the challenged product has no place in a design defect case. Likewise, where a vehicle falls on a statistical chart does not tend to prove or disprove whether it is defective under Mississippi law.

The testimony and opinions offered by Ford through Padmanaban do nothing more than compare the Explorer's accident rates against other vehicles, in order to support Ford's argument that the Explorer is no worse than other vehicles. Padmanaban's testimony does not relate to appropriateness of the design of the Explorer or whether the design is defective. The fact that other sport utility vehicles or passenger cars may also rollover, and the frequency with which the Explorer and other vehicles are in various kinds of accidents, is simply not probative. Moreover, Padmanaban's analysis includes all different types of vehicles involving all sorts of different accidents occurring under all sort of different conditions. None of this information is helpful to the jurors in this case who must determined whether this 1996 Ford Explorer is defective, and even more precisely, whether this Ford Explorer should have rolled over, and the door opened, in

7

this particular accident.

B.  **Unreliable Data**

In *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So.2d 716, at 723 (Miss. 2005), the Court held:

> The text of Rule 702 provides that the trial judge is to act as a gatekeeper, ensuring that expert testimony is both relevant and reliable. *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167. Relevance of expert testimony means it will, according to the Rule, assist the trier of fact. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786. Scientific knowledge means something more than unsupported speculation or subjective belief that is grounded in methods and procedures of science. Id at 590, 113 S.Ct. 2786.

Pursuant to *Daubert* and *Kumho Tire*, this court is the "gatekeeper" in deciding whether the "evidence" is reliable.

Ford's statistics provide little or no illumination regarding stability and handling design and/or crashworthiness defects in the Ford Explorer. The statistics are irrelevant and unfairly confusing to the jury; just the type of "junk science" that *Daubert* and its progeny preclude. Beyond the fact that Pabmanaban's statistics do not fit the facts of this case, the statistics also fail the reliability prong of the scientific evidence test. The databases Padamanaban uses are unreliable. For instance, the FARS database relied upon by Padmanaban represent only one percent of all light vehicle-tow away crashes, and only reflects fatalities occurring within thirty days of an accident. Several courts have considered the limited value of the FARS database and found this sampling too minimal upon which to draw conclusions. **FORD AGREES.** Ford itself has argued that the FARS data is incomplete and inaccurate and that it lacks any validity whatsoever, as a predictor of vehicles rollover performance. In *Griego et al. v. Ford*, United States District Court, Southern District Court of Georgia, Savannah Division, Case No. 96-00087-CV-4, Ford moved the Court to exclude testimony of Plaintiffs' expert because, among

8

other things, his testimony was premised on FARS data, **"which Ford says is inherently unreliable, skewed, etc."** (**Exhibit D**, emphasis added.) See also **Exhibit C**, Ford's Motion in Limine, in *Lajeunesse vs. Ford* pp. 6-7. Ford should not be allowed to now take a contrary position, when doing so suits its litigation needs.

As a District Court in Missouri recently explained in rejecting another statistician's proposed testimony:

> The Court determines that Dr. Peterman's testimony and expert report are inadmissible…Firstly, the Court cannot simply dismiss his failure to review the underlying data for accuracy. Granted that statisticians may often rely on "secondary data" (data collected by others) and not "primary data" (data collected by the researcher himself or herself), in this case, he relied upon "tertiary data". Given the importance of the accuracy of the underlying data, a fact he admitted, it would have been prudent for him to examine the test report forms and the debriefing forms to assure himself of the accuracy of the underlying data.

*Metropolitan St. Louis Equal Housing Opportunity Council v. Gordon A. Gundaker Real Estate Co.*, 130 F. Supp. 2d 1074, 1087-88 (E.D. Mo. 2001).

### C. The Data Relied Upon by Padmanaban Fails the Substantial Similarity Test

In Mississippi, to be probative of a design defect, the evidence must show that the similar accidents occurred under substantially similar circumstances and involved substantially similar components. *Hagency vs. Jackson Furniture of Danville*, 746 So.2d 912 (Miss.Ct.App.1999). All of Padmanaban's opinions are based upon statistics of other accidents, none of which can be shown to meet the "substantial similarity" test for admissibility. In a products liability case, the rule of "substantial similarity" prohibits the admission into evidence of other occurrences unless the proponent first shows that there is a substantial similarity between the other occurrences and the claim at issue in the litigation. It is well established that evidence of other incidents must be "similar" in all respects to be admissible. *Cooper Tire & Rubber Co. v. Crosby*, 273 Ga. 454,

9

543 S.E.2d 21 (2001). "The showing of substantial similarity must include a showing of similarity as to causation." [FN omitted] Without such showing, the evidence is irrelevant as a matter of law." *Stovall v. DaimlerChrysler Motors Corp.*, 270 Ga.App. 791, 793, 608 S.E.2d 245, 247 (2004). This is true even where the evidence purports to be "statistical." *Id.* at 794 (no error in excluding statistical data where proponent failed to show any similarity among the complaints represented by the data and Stovall's alleged defect); *Cooper, supra* (exclusion of adjustment statistics where there was no showing of substantial similarity). *See also* the unpublished decision in *Hockensmith v. Ford Motor Company*, No. 03-13729, in which the Eleventh Circuit Court of Appeals held that substantial similarity with the *Hockensmith* accident was required for admission of William Wecker's statistical evidence, where that evidence was offered to show that the Ford Explorer does not have an unreasonable propensity to roll over in comparison to other compact utility vehicles. (**Exhibit E**, pp. 9-11).[1] Likewise, in several other cases, statistical experts have been excluded for precisely the same reasons. See **Exhibits F** through **J**.

This application of the "substantial similarity doctrine" was also applied by the 5th Circuit Court of Appeals in *Battistella v. Daimler Chrysler Motors, Co., LLC*, 2004 WL 1336444 E.D.La.,2004., Jun 14, 2004, (5th Cir. 2004) (N.S.O.P.) The *Battistella* Court stated, in excluding Dr. Baxley's testimony:

> Dr. Baxley used consumer complaints and similar information about other accidents to form his opinions about Plaintiff's accident and injuries. (See National Highway Transportation and Safety Administration (NHTSA) consumer complaints involving 2001, 1999, 1998, 1995 and 1994 Dodge Ram trucks and the failure of air bags to deploy during a frontal collision .... However, while evidence of other incidents may have some probative value if substantial similarity to the subject accident is established, Dr.

---

[1] See also, *Baker v. Deere and Co.*, 60 F.3d 158 (3rd Cir. 1995) (lack of showing of substantial similarity was the basis for preventing an expert from using statistical testimony to support his argument).

10

> Baxley lacks sufficient information concerning any of the incidents upon which he relies to satisfy this requirement. (Baxley Dep. at 34-36, 75, 80, 83-84, 87). And although Dr. Baxley claims to have based his opinion on other cases in which air bags failed to deploy and the driver sustained injuries more serious than Plaintiff, he did not explain the relevancy of these cases. (Id. at 38- 41).

The United States Court of Appeals Circuit, in *Jaramillo v. Ford Motor Company*, 116 Fed.Appx. 76 (2004)(N.S.O.P.), held, in part:

> To be relevant, Ford's comparative accident statistics must be based on accidents that occurred under circumstances similar to the Jaramillos' accident, i.e. a rollover on smooth, dry pavement. '[E]very court of appeals ⋯ agrees that when a plaintiff attempts to introduce evidence of other accidents as direct proof of a design defect, the evidence is admissible only if the proponent demonstrates that the accidents occurred under circumstances substantially similar to those at issue in the case at bar.' *Barker v. Deere and Co.*, 60 F.3d 158, 162 (3d Cir.1995). While this substantial-similarity doctrine has normally been applied to preclude other-accident evidence offered by plaintiffs, we have explained that the doctrine 'rests on the concern that evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402.' *Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir.1991). Because this underlying concern is not limited to comparative accident statistics offered by plaintiffs, defendants like Ford that attempt to compare their products to others to show the relative safety of their designs or a lack of notice must show that their comparisons are based on accidents that are similar to the plaintiff's accident. (Emphasis added.)
> (See **Exhibit F**, pp. 78-79).

Clearly, the strict scrutiny of the courts that applies each time evidence of other individual actions are offered should <u>not</u> be abandoned simply because the "other accidents or injuries" appear in greater number as part of a statistical compilation. In fact, some courts have recognized an <u>even greater need</u> to scrutinize evidence of other accidents and injuries when they are offered in the hodgepodge form of statistics. The following exchange illustrates the inherent confusion and prejudice of statistical risk analysis. This exchange took place between defense counsel and the Honorable Barbara J. Rothstein, Federal District Court, Western District of

11

Washington, on defense counsel's claim that statistical evidence is exempt from the substantial similarity rule:

> COUNSEL: Statistical data is a completely different methodology than what the plaintiff's burden is in having to show evidence of similarity for defect . . . . The comparative analysis that Doctor McCarthy is going to be utilizing, it involves taking the risk data from the pool of all available information and putting that under consideration and determine whether or not a policy or a product is or is not unreasonably dangerous.
>
> It is the most scientific tool used today by all government agencies. NHTSA uses it, the Environmental Protection Agency uses it. They all use statistical data to determine safety.
>
> COURT: Counsel, I love it. I've been waiting for somebody to actually make that argument, and I hope you didn't mean to make that argument you just made. Of course it matters what the statistics are based on, otherwise statistics can say anything, and that's the problem we have with statistics, especially in a court of law.
>
> COUNSEL: Yes, Your Honor.
>
> COURT: The statistics must be based on a relevant foundation and that foundation must conform to the case we have before us.
>
> COUNSEL: Yes, Your Honor.
>
> COURT: So it will be a matter of laying an adequate foundation. You are going to have to convince the Court that statistics are based on sufficiently similar accidents and incidents before they can come in. Just saying that, well, there are just statistics, therefore we are only dealing with statistics and we know that they are scientific, uh-uh, that doesn't get you there. Out of the presence of the jury I'm going to have to be persuaded that his statistics are based on similar enough accidents so that they warrant coming in. If they are not...they're not coming in...But statistics alone, the fact that somebody had done a sampling of different situations doesn't get you there.

*Kenneally v. Suzuki Motor Corp.*, Case No. C93-0867R (W.D. Wash.) By Padmanaban's own admissions in deposition, she does not and cannot meet the substantial similarity requirement.

### D. Inadmissible Hearsay

Compounding all of the reliability problems noted above is the fact that the federal and state databases are made up of layer upon layer of inadmissible hearsay which includes the subjective interpretation of various individuals far removed from Padmanaban. The process starts with *some* type of record – FARS uses twenty or so *different* types of records to gather information, from hospital records and death certificates to accident reports. Those records were created by others, often based on statements from people a step or more removed from the author of the records. Someone on behalf of FARS then deciphers the information from the various records and inputs it into a computer through a coding process. Any minor notation, reporting, or coding error anywhere along the hearsay chain would change the data points for the incident, as would any error by Padmanaban or her staff in gathering, searching, evaluating, compiling, and combining the incident numbers.

Moreover, the underlying support for Padmanaban's statistics are police reports (although she has not reviewed them). Information contained within police reports is hearsay unless it meets a statutory exception. In the case of the accident reports contained within the databases used by Padmanaban, there is no way to determine how much or what portions of the records amount to pure hearsay. The databases includes all types of vehicles and accidents, are encoded into the database by persons who have no personal knowledge of the events, use very broad codes, and include a wide variety of fact patterns and varied methodology. Padmanaban's opinions are therefore based on hearsay, incomplete and unreliable data, and are therefore inadmissible. **AGAIN, FORD AGREES.** In *Lajeunesse, et al. v. Ford Motor Co.*, S.Ct. of California, Case No. CIG755577, discussed previously and marked as **Exhibit C**, Ford filed a motion in limine to exclude the Insurance Institute of Highway Safety, April 1992 and May 1992

13

status report (IIHS Reports). In that motion, Ford points out that the IIHS Reports rely on inadmissible hearsay; namely, the FARS database:

> Not only are the IIHS Report and Status Report hearsay, but they also contain multiple levels of hearsay. As mentioned above, the Report's authors rely upon the Fatal Accident Reporting System ("FARS"), an automobile accident database compiled by the federal government from various police accident reports. The information contained within the accident reports upon which FARS relies is often obtained from unknown eyewitnesses by police officers, as well as the officers' own observations. Someone else then interprets that information before it is inputted into the FARS database. Such hearsay upon hearsay is inadmissible. (See pages 4-6 of **Exhibit C**)

### E. Ford's Statistical Comparison Of Accident Rates Between The Ford Explorer And Other Dissimilar Vehicles Is Outweighed By Prejudice And Consumption Of Time.

Assuming there is any relevance to Ford's use of statistics, this evidence is properly excluded under Federal Rule of Evidence 403.

Plaintiffs' claim here is that the Howard's 1996 Ford Explorer is defective and unreasonably dangerous. There is no case in Mississippi stating that because a vehicle is not the worst on a statistical chart it is not defective, which is the focus of Padmanaban's exhibits and testimony. Padmanaban's testimony, based as it is on statistical aggregation, will only confuse the issues and claims to be tried. The jury will be misled into thinking that they must decide whether all makes or brands of SUVs are defective. Padmanaban's "evidence" does not tend to prove or disprove the question of whether the Howard Explorer is defective. The "evidence" instead intentionally deflects away from the real issue in this case.

Admission of Padmanaban's testimony and statistics should also be excluded because any minimal probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, and will result in undue delay and waste of time. Padmanaban's testimony, in the form of mathematical and statistical compilations, carries an

14

aurora of authority that the average jury finds difficult to disregard, even when the underlying data is shown to be unreliable. In *People v. Collins* 68 Cal.2d 319, 330 (1968), a robbery conviction was reversed based on unreliable and inaccurate statistical information. The Court noted that "few jurors could resist the temptation of according disproportionate weight to the [statistical] index . . ." *Id.* at 330. "Under the circumstances the trial by mathematics so distorted the role of a jury and so disadvantaged counsel for the defense as to constitute in itself a miscarriage of justice." *Id.* at 332.

Likewise, here, jurors are certain to give enormous and undue weight to any statistical evidence they receive. The mystic of mathematics and statistics is a reality of our society and jurors will retain and remember a statistic above all other evidence because of its false veneer of reliability as a hard fact. No amount of rebuttal evidence regarding the unreliability of the data from which the statistics were formed will ever erase the false importance of the statistical figure in the mind of the jury. Once the bell of statistical evidence has been rung, Plaintiff will have little chance to rebut it, and an enormous prejudice will result.[2]

Indeed, by way of example, if this were a lawsuit against Jack-in-the-Box for an injury from ingestion of e. coli in hamburgers, at issue would be whether the Jack-in-the Box hamburger cooking design was defective. Jack-in-the-Box would not be excused from product liability by showing that more children have died from ingesting hamburgers made using the McDonalds or Burger King cooking process. Nor would Jack-in-the-Box be permitted to put in statistical testimony that it is a "mid-runner" in e. coli poisonings across any number of prepared

---

[2] *See, Recreational Developments of Phoenix v. City of Phoenix*, 220 F.Supp.2d 1054, 1061 (D. Ariz. 2002) ("Report includes statistical assertion that are not based on identifiable study design or even basic sampling techniques. The probative value of such evidence is far outweighed by its potential to mislead and confuse the fact-finder"); *Martincic v. Urban Redevelopment Auth. of Pittsburgh*, 844 F. Supp. 1073, 1075-76 (W.D.Pa.1994) (excluding statistical report as prejudicial under Rule 403 where expert "offered no semblance of statistical analysis that would breathe life into his bare numbers").

foods, including juice and mayonnaise. Nor could it argue that its burgers were not defective because any person in the United States has a greater relative risk of dying from another tragedy at any given time. The misleading nature of the resulting statistical comparisons is obvious. By including such dissimilar vehicles in her analysis, Padmanaban manages to make the Explorer look better than it is in comparison to its real peers.

Accordingly, because any probative value of the evidence is substantially outweighed by the danger of unfair prejudice and consumption of time, evidence regarding statistical comparison of accident rates between the Ford Explorer and other dissimilar vehicles should be excluded.

### F.    Failure to Provide Exhibits

Ms. Padmanaban intends to present during the course of her testimony various charts that she will create to support her opinion. She did not, pursuant to the Notice of Deposition, have those charts available for examination during her deposition. Furthermore, she was unable to discuss the nature of the exhibits she intends to create. In her deposition testimony, **Exhibit B**, beginning at page 135, line 16, she states:

> Q (BY MR. BARNHART):  "At trial I anticipate presenting exhibits illustrating the data and findings upon which the above opinions are based. My analyses are based on materials reviewed to date and I reserve the right to revise my Analysis and opinions if additional information becomes available." As we sit here today, almost four months after you wrote the report, have you come up with any new opinions besides this information you put in there about door openings? (Reading from her report.)
>
> A    No.
>
> Q    Do you intend to have charts about door openings?
>
> A    I might.
>
> Q    What kind of exhibits do you intend to have that will illustrate your --

16

> the data and findings?
>
> THE WITNESS: Again, I haven't thought about all the exhibits. And all I have done is just the analysis right now because of Mr. Sances' deposition last week. So, I haven't really given it thought yet.

Hence, Padmanaban's failure to provide her charts or, at a minimum, to be able to discuss the nature of the charts she intends to use is merely an attempt to avoid providing the data to the opposing party for review and cross-examination

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court exclude from trial statistics that have been proffered by Ford's expert witness Jeya Padmanaban, and prohibiting the Defendant Ford from attempting to introduce any statistical evidence, as any such evidence is irrelevant and/or unduly prejudicial and an undue waste of time.

Respectfully submitted,

_____
Omar F. Medina, Esquire
Florida Bar No.: 0789860
Medina Law Firm
505 South Magnolia Avenue
Tampa, Florida 33606
Telephone:   813-258-5838
Facsimile:    813-258-2988
--AND--
W. Randolph Barnhart, Esquire
Colorado Reg. No. 5186
Michael J. McNally, Esquire
Colorado Reg. No.
Barnhart, Ekker & McNally, LLP
7887 East Belleview Avenue, Suite 1200
Englewood, Colorado 80111
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been sent to: J. Patrick Strubel, Esquire, Huie, Fernambucq & Stewart, Three Protective Center, 2801 Highway 280 South, Birmingham, Alabama 35223; J. Stephen Kennedy, Esquire, Baker, Donelson, Bearman, Caldwell & Berkowitz, Meadowbrook Office Park, 4268 I-55 North, Jackson, Mississippi 39211; W. Randolph Barnhart, Esquire, Michael J. McNally, Esquire, Barnhart, Ekker & McNally, LLP, 7887 East Belleview Avenue, Suite 1200, Englewood, Colorado 80111-6015, via the United States Postal Service on this the 19th day of December, 2005.

Respectfully submitted,

Omar F. Medina, Esquire
Florida Bar No.: 0789860
Medina Law Firm
505 South Magnolia Avenue
Tampa, Florida 33606
Telephone:   813-258-5838
Facsimile:   813-258-2988
Attorney for Plaintiffs
(Appearing Pro Hac Vice)